

# NUMBER 13-10-00232-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

EZEQUIEL CASTILLO, INDIVIDUALLY, MARIA
DE LOS ANGELES CASTILLO, INDIVIDUALLY
AND AS NEXT FRIEND FOR ASHLEY CASTILLO
AND EZEQUIEL CASTILLO JR., AND ROSA
SILVIA MARTINEZ, INDIVIDUALLY,                    Appellants,

v.

FORD MOTOR COMPANY,                              Appellee.

On appeal from the 404th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellants, Ezequiel Castillo, individually, Maria De Los Angeles Castillo,

Individually and as next friend for Ashley Castillo and Ezequiel Castillo Jr., and Rosa

Silva Martinez, individually, appeal a take-nothing judgment in favor of appellee, Ford Motor Company ("Ford"). Appellants contend that Ford failed to prove its affirmative defenses of mutual mistake and fraudulent inducement, the trial court admitted inadmissible evidence concerning jury deliberations, and there was no evidence of juror misconduct due to an outside influence.[1] We reverse and remand.

## I.    BACKGROUND

Appellants were injured in a roll-over accident involving a Ford Explorer and sued Ford for personal injuries sustained during the accident (the "personal injury case"). During jury deliberations, a note was sent to the judge asking, "What is the maximum amount that can be awarded?" (the "complained-of note"). The parties then entered into a Rule 11 agreement and settled the cause for three million dollars. After entering into the agreement, Ford's attorneys spoke with several of the jurors and discovered that some jurors had asked the jury foreperson not to send the complained-of note to the judge. Ford refused to tender the three million dollars to appellants, claiming that it had been fraudulently induced into entering the contract and that it had entered the contract based on a mutual mistake.

Appellants asserted a breach of contract claim against Ford. Ford sought to avoid the settlement agreement based on mutual mistake, unilateral mistake, and fraudulent inducement. The trial court granted summary judgment in favor of appellants on the claim for breach of contract, and a panel of this Court affirmed the judgment. *See Ford Motor Co. v. Castillo*, 200 S.W.3d 217 (Tex. App.—Corpus Christi 2006), *rev'd*, 279 S.W.3d 656 (Tex. 2009). After granting Ford's petition for review and

---

[1] We have reorganized and renumbered appellants' issues for the purpose of this memorandum opinion.

concluding that the trial court abused its discretion in denying Ford the right to conduct discovery on appellants' claim for breach of contract, the Texas Supreme Court reversed the summary judgment and remanded the case to the trial court for further proceedings.[2] *See Castillo*, 279 S.W.3d at 667.

On remand, appellants' claim for breach of contract was tried to a jury. The only issues in dispute were Ford's affirmative defenses to the agreement. Prior to trial, Ford stipulated that it had entered into the agreement and that appellants would be entitled to recover on their breach of contract claim if Ford did not prevail on any of its affirmative defenses. During the trial, Ford called former jurors as witnesses to establish that the jury foreperson in the personal injury case, Cynthia Cortez, did not have the permission of some of the jurors to send the complained-of note asking about damages.

The jury found that Ford's compliance with the settlement agreement was excused by mutual mistake and fraudulent inducement. The jury made a specific finding that the note sent by Cortez was a material misrepresentation "sent by or at the direction of [appellants] or their agents or representatives with the knowledge that it was false . . . with the intent that [Ford] rely on the misrepresentation." A take-nothing judgment was entered, and this appeal ensued.

---

[2] The trial judge who previously granted appellants' summary judgment for breach of contract was Abel Limas. In Coronado, the Texas Supreme Court held that an order denying summary judgment signed by Limas was void. *Freedom Communs., Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012). The court took judicial notice of and relied on a plea agreement signed by Limas. *See id.* The court further held that neither it nor this Court had the authority to address the merits of the appeal. *See id.*

"[A]ppellate courts do not have jurisdiction to address the merits of appeals from void orders or judgments; rather, they have jurisdiction only to determine that the order or judgment underlying the appeal is void and make appropriate orders based on that determination." *See id.* at 623. We have a duty to sua sponte determine whether this Court has jurisdiction to address the merits of an appeal. *See id.* at 623–24. We have therefore reviewed Limas's plea agreement relied on by the supreme court in *Coronado*, and we have found nothing indicating that the order granting summary judgment was void. Accordingly, we have jurisdiction to address the merits of this appeal.

3

## II.    SUFFICIENCY OF THE EVIDENCE

By their first and second issues, appellants contend that Ford failed to prove its affirmative defenses of mutual mistake and fraudulent inducement. Specifically, they argue that as a matter of law, there could not have been a mutual mistake and there was insufficient evidence to support the jury's findings of mutual mistake and fraudulent inducement. Regarding fraud, appellants argue that there is no evidence that the note was sent by Cortez at the direction of the appellants or at the direction of their agents or representatives. At oral argument, Ford urged this Court to conclude that it was unnecessary in this case to prove that the note was sent at the direction of appellants, their agents, or their representatives. Ford also argued that it is excused from the contract even if it proved that Cortez committed fraud on her own.

### A.    Standard of Review

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 823 (Tex. App.—Fort Worth 2007, no pet.) (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998); Robert W. Calvert, "*No Evidence*" *and* "*Insufficient Evidence*" *Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)). In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not.

*City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 822.

**B.    The Evidence**

      1.    Ford

Peter Tassie testified that he is Ford's managing counsel and that he was involved in negotiating a settlement with appellants' trial attorney, Mark Cantu. Tassie stated that Ford's trial attorneys in this case were Eduardo Rodriguez, Warren Platt, and "Jerry Giordano."[3] Tassie explained that in the personal injury case, the plaintiffs established that they were in a 2001 Ford Explorer that rolled over. Ford was concerned that the accident occurred on a wet surface on a curve and that the vehicle "went off the road." Tassie stated that although most of the injuries were minor, appellant, Rosa Martinez suffered a serious injury.

Tassie agreed that there were two questions on liability: the first question regarded whether there was a design defect in the roof strength of the vehicle, the second question asked, "Was there a design defect regarding handling and stability in the 2001 Ford Explorer that was the producing cause to [sic] the injuries of Ms. Martinez." Tassie explained that the jury charge in the personal injury case was a "conditional charge" "because it says, 'If you answered yes to Questions 1 [or] 2, then answer the following question," on damages; and, the jury was not "allowed to get to the damages questions" until it answered "yes" to either question one, two, or both.

---

[3] It is unclear from the record if this is the proper spelling of the attorney's name.

According to Tassie, "if you've answered no to both of those [questions], you never talk about the damages question."[4]

Tassie recalled that the jury went home for the weekend, and that on Saturday, he received a call from Cantu, who wanted to talk about settling the case. Tassie stated that during this conversation, Cantu asked for fifteen million dollars and Tassie informed Cantu that that was unreasonable. Tassie testified that on Monday when the jury submitted notes asking for testimony from the expert witnesses on "handling and stability," "we read that to mean" that the jury had answered question number one, and "we're fairly confident we didn't think the roof allegation was a strong allegation anyhow because this vehicle actually rolled into some boulders."[5] Tassie believed that the jury had answered question number one in favor of Ford. Tassie acknowledged that he and Cantu discussed the notes concerning the expert witnesses. When asked, "Not necessarily specifically where they [the jury] were, plus or minus, you thought it was a good sign, Mr. Cantu thought it was a good sign for him, right," Tassie replied, "Right."

Tassie stated that on Tuesday, the jury did not deliberate because a juror had been in the hospital with a sick child all night.[6] According to Tassie, that day, Cantu eventually demanded four million dollars and Tassie offered one million dollars. When asked why he made the offer, Tassie explained that Cantu "had moved a considerable amount from an unreasonable number, we thought, but it was starting to get into the

---

[4] Nowhere in the jury charge did the trial court instruct the jury that it could only *discuss* the issue of damages if the jury answered "yes" to either question one or two. It merely stated that if they did not answer "yes" to questions one or two, it should not *answer* the questions on damages.

[5] Although Tassie mentions that he discussed the jury note concerning the experts on "handling and stability" with Cantu, it is unclear who he refers to as "we."

[6] That juror was Cortez, the jury foreperson.

6

range where it made sense to continue negotiations. So I thought taking that step would keep things moving." Tassie did not believe that there was anything "wrong" with the Explorer, but decided to settle for one million dollars "because [Ford] can't fight every case and try every case, and there's still risks. . . . There's too many things that you can't control, witnesses, juries, judges, jurisdiction, all those things can change and they aren't things you can control. . . ." Tassie continued, "There are cases we think we should have won that we lost, and cases, you know, the same thing that we thought it was going to be a really tough case because of all those factors and we won. . . ."

Tassie testified that he and Cantu eventually, in their numerous and lengthy discussions, "added in the element of a structured settlement for Ms. Martinez." Tassie said a structured settlement "is where you take part of the money and you actually place it with a company and it gives periodic payments. In this case, monthly payments over time so that rather than one big payment, the person can get payments every month, literally for the rest of their life." The men discussed that Rosa would receive $2,500 per month for life and it would be guaranteed for fifteen years. The men had also discussed incremental payments of two percent, in other words, "[i]t would slowly, over time, it would increase by two percent a year so that that monthly payment would actually increase over time."

However, according to Tassie, the men had not yet entered into an agreement; Cantu's demand was $1.96 million and Tassie's offer was $1.5 million. Tassie stated that he eventually proposed $1.75 million and Cantu rejected that amount. When asked if he knew the breakdown of Cantu's demand, Tassie said Cantu wanted the following: (1) $850,000 for costs, including "all the expenses in putting the case together, paying

the expert witnesses, filing fees, all the things that you have to do to try a case that both sides have to spend"; (2) $400,000 for attorney's fees; (3) "$540,000 was the cost of the structure"; and (4) $100,000 for modifications to Rosa's house. Tassie did not state how much Cantu requested for the other appellants' injuries.[7]

According to Tassie, the men agreed that if there were any other questions submitted by the jury, each would be free to change his demand or offer. Tassie stated that Cantu then told him that "if there's a note from the jurors about damages, then my demand will go back up to $3,000,000.00." Tassie believed that it was reasonable for a demand to increase if it is determined that the jury is deliberating the damages. Tassie testified that Cantu would not come down on his demand of $1.96 million, and Cantu told Tassie that he would be contacting the judge to intervene in the negotiations process.

Tassie then received notice that the jury had sent a note to the judge asking for clarification on the difference between preponderance of the evidence and beyond a reasonable doubt. Tassie stated that Rodriguez then informed him that the jury sent out the complained-of note asking about damages. Tassie immediately requested authority to settle the case for three million dollars. Tassie testified that he had never seen a note such as the complained-of note before or after this case. Tassie agreed that based on jury notes, an attorney could "tell . . . what particular [issue] the jury might be trying to evaluate in the charge[.]"

The men entered into the settlement agreement for three million dollars. When asked if it were possible that he offered Cantu $2.25 or $2.5 million before he became

---

[7] Although Tassie did not state how much Cantu was demanding for the other appellants' injuries, Tassie stated that the numbers added up to $1.95 million and not $1.96 million as demanded by Cantu.

8

aware of the complained-of note, Tassie responded, "Couldn't be true, because I didn't have authority to do that. . . . My authority was $1,000,000.00, and I had 1.5 million in authority, and that's why I said if we were going to split the difference at 1.75, if he would make that demand, then I would go back and try to get that authority."

Ford's attorneys spoke with the jurors after the parties entered into the settlement agreement. Tassie stated,

> He [Rodriguez] told me generally that there was some concerns by the other jurors, that they weren't aware of that not[e] going out, and that they were confused and didn't understand why the case settled while they were still deliberating on the liability issue. And I decided at that point, that we needed to investigate further and find out what really happened.

Tassie claimed that the complained-of note undoubtedly indicated that the jury was deliberating the issue of damages. He stated, "There is no guesswork at this point when you get the wording of that note. . . . If the jury is following the instructions, they can't discuss the damages question unless they've answered yes to one of the first two questions."[8]

Tassie stated that he was concerned with the jury process, so Ford chose not to pay the three million dollars and to defend any breach of contract claim in court. Tassie explained, "If they could go around the rules, ignore the rules and indicate that one person could indicate that the jury has already decided and you've lost when, in fact, that isn't the case, then we can't make our decisions and do what we think is right going forward." Tassie stated that Ford was not paying the three million dollars because "the

---

[8] Again, we note that the jury charge had no such instruction. It merely instructed the jury not to *answer* the questions on damages if they answered no to questions one and two. The jury was not instructed that it could not *discuss* damages unless it answered questions one or two affirmatively.

9

entire process" was at stake and that "we count on when we go in for that process is that we're going to get a fair trial by a jury of 12 people, not a jury of one."

According to Tassie, he relied on the complained-of note and "everything changed when this note came out." Tassie testified that he would not have settled with Cantu for three million dollars if that note had not been sent. Tassie stated that the note could only have meant that the jury was deliberating damages in the case. When asked, "Did you rely on this note as being accurate and reflective of the deliberation process when you went out and got authority for $3,000,000.00," Tassie replied, "Yes, sir." Tassie also responded, "Yes sir" to, "And did you later find out that that was not true?"

On cross-examination, Tassie urged that the jury was not allowed to discuss damages unless it determined that Ford was liable. When asked, "[W]here does it say the question must be answered in order in the jury instructions," Tassie replied, "It doesn't say they have to be answered in order. It says you're not to answer the damages question until you've answered—unless you've answered No.1 or No. 2 yes."

Tassie claimed that the complained-of note led Ford to settle the case with appellants. Tassie stated that the complained-of note was not from the jury as a whole but that the foreperson had sent the note out without the other jurors' knowledge. Tassie claimed that Ford's evidence supporting its position was "that one juror sent out a note on behalf of the whole jury that the rest of the jury did not even know about or didn't agree with, and that was the basis for us settling the case for $3,000,000.00."

Cantu testified that he did not participate in the courtroom as appellants' advocate but that he was in the courtroom every day of the trial and had the sole

10

authority to enter into a settlement agreement. Cantu recalled that Tassie had offered $2.3 million, and that Cantu had demanded three million dollars on the night before they entered into the settlement agreement. Cantu had authority to settle for three million dollars.

Cantu explained that the accident causing appellants' injuries occurred on a trip back to the United States from Mexico outside of San Luis Potosi, Mexico and that all of the occupants were wearing their seatbelts. Rosa was the only occupant seriously injured, while the other occupants "walked away from the accident."

Cantu testified that the attorneys were merely guessing about the jury's deliberations based on the jury's questions sent to the trial court. He said, "So, [the jury] had a question on preponderance of the evidence and beyond a reasonable doubt. There was never any discussions on the case of beyond a reasonable doubt. It was not a criminal case. It was preponderance of the evidence. . . ." Cantu explained that based on his experience, it is never clear what the jury is going to do. Cantu said, "If I knew what a jury was going to do . . . I'd probably be in New York City right now as a jury consultant and making millions of dollars."

When asked if he recalled telling Tassie that his demand would increase to three million dollars if the jury sent out a note on damages, Cantu stated, "Absolutely not." Cantu explained:

> What I remember talking to him that day before was that I wanted $3,000,000.00 and he was at $2.3 million. That's what I remember. I don't remember saying anything about—but it stands to reason that if I got a jury note that said what is the maximum amount that can be awarded, I should have gone to 5,000,000 or $7,000,000.00, but I didn't because I knew that I had problems with the appellate process with what the appellate court was going to do.

11

I had problems with Nash, my expert. I didn't know whether his testimony was going to be scrutinized by the [Texas] Supreme Court and struck.

Cantu claimed that it was Tassie who informed him about the jury note concerning damages. After receiving notice of the note, the parties settled the case for three million dollars. Cantu acknowledged that he had never seen a note like the complained-of note before.

Cantu testified that the jury charge did not have any instructions concerning how the jury notes were to be sent to the trial court, and he could not tell from the notes alone whether the entire jury had asked the question or whether only a few jurors or one juror had asked the question. Cantu stated that he was not going to rely on the note and request more than three million dollars, and he believed Ford should not have relied on the note either. According to Cantu, had he actually relied on the note, his demand could have increased to seven million, eight million, or ten million dollars. He only had a jury note and did not know if one or more jurors had the question; so Cantu stated he decided to settle the case when Tassie's offer went up to three million dollars.

Cantu asserted that, because the jury charge did not address the issue of jury notes, the jury was free to ask any question it wanted to ask. Cantu opined that "you never know what a jury is going to ask. And you cannot rely on one question or two questions." Cantu pointed out that a note was later found, which had not been received by the trial court because the parties settled. Cantu recalled that the note asked how the money would be distributed between the attorneys and the families. Cantu explained that, had he seen this note, he would have believed that the jury was

maybe worried about different issues, and [that it was] not answering question 1 or 2 or 3 or 4, but [that it] wanted to know maybe—maybe the

12

jury didn't like my—my—the attorney that was—that tried the case for me, or maybe the attorneys were liked. You never know what a jury is thinking. I don't know—I know that Cindy Cortez sent that note out, but how many jurors asked for that, I have no idea.

Rodriguez, Ford's trial attorney in the personal injury case, testified that he did not recall ever seeing a note such as the complained-of note in this case in almost forty years of practicing law. Rodriguez explained that the jury charge in the personal injury case was a conditional charge because the jury would not reach the issue of damages unless it found Ford liable. Rodriguez stated that the complained-of note gave him "information that—that the jury had already decided the issue of liability and they were deciding how much damages to award."

Rodriguez recalled that the night before the settlement agreement, Tassie had made an offer somewhere in the range of $1.2 million and Cantu had demanded somewhere in the range of $2.9 million. Rodriguez believed that the only reason the offer went up to three million dollars the next day was due to the complained-of note.

After the parties settled, Rodriguez went to talk to the members of the jury; however, Cortez left before Rodriguez entered the jury room. Rodriguez stated that one of the jurors said, "Look we set aside all the—all the damage documents. They're over here. We hadn't gotten to them."

On cross-examination, Rodriguez stated that he was concerned about the complained-of note because "in [his] 40-some years, or at that point 30-some-5 or 39, 36 years of practice and trying over 200 cases, I had never come across a situation where the foreperson of the jury had sent a note on his or her own, without the other jurors approving of that note." Rodriguez explained that he was told by the jurors that they told Cortez not to send out the note and that they had voted eleven to one on

13

question one in favor of Ford. Rodriguez also recalled that several of the jurors told him that Cortez would send a note to the trial court only if all of the jurors agreed to send the note.

Cortez testified that she was the foreperson in the personal injury case in 2005. Cortez could not remember how she became the foreperson but thought that the other jurors probably elected her foreperson. Cortez agreed that there had to be a "consensus" before a note was sent to the trial court and that the communications were to come from the jury as a whole. Cortez acknowledged that the jury was not supposed to answer any questions on damages unless it had answered yes to either question one, two, or both. Cortez recalled that notes were sent to the trial court; however, she could not recall any specific notes she wrote. Cortez acknowledged that all of the jurors agreed to send the note to the trial court asking to clarify the difference between preponderance of the evidence and beyond a reasonable doubt and that she included the explanation that some of the jurors were confused. Regarding the complained-of note, Cortez said, "I'm not really sure why we asked that question" and that "[i]t was obviously something we [the jury] discussed together . . . ." Cortez assumed that the jurors discussed the complained-of note because it was the procedure to do so. However, Cortez did not remember discussing any of the jury's notes. Cortez stated that she did not believe that she would have sent the complained-of note to the trial court without the other jurors' agreement because she followed that procedure. Cortez denied talking to anyone other than the other jurors about the personal injury case and denied talking to lawyers during the pendency of the personal injury case.

14

On cross-examination, Cortez testified that she was not aware that Ford's attorneys and appellants' attorneys were reading the notes she sent to the trial court. She stated, "I thought they [the notes] were just going to the judge."

Benigno "Trey" Martinez testified as an expert witness for Ford. Martinez explained that the jury communicates with the trial court via the presiding juror who sends notes to the trial court. When a jury note is received, the trial court usually allows the attorneys on each side an opportunity to read the note. Both sides then attempt to determine what the note means. Martinez opined that "jury notes would affect anybody's decision in coming to an opinion or a decision on a case." Martinez explained that when attorneys read jury notes, "they're going to try and guess where they're [the jury] at based upon the notes that are out there, so, yes, it's [knowing that a jury charge is conditional is] important."

Martinez stated that knowing that a jury had answered the questions on liability and were now deliberating damages would be material and important and that he would rely upon that note to make decisions concerning a case.[9] Martinez testified that any time a note is sent to the trial court, he presumes that it has been asked by the entire jury. Martinez agreed that any juror could ask the foreperson to ask any question; however, once the foreperson asks the question, it is on behalf of the entire jury. Martinez believed that the jury notes "should be reflective of the deliberation process of the case at hand. And when the judge receives a note, she doesn't go back and sit there and say a juror has a question. She comes back to the lawyer and says the jury has a question. . . ."

---

[9] The complained-of note did not state that the jury had answered any of the questions.

Martinez opined that the complained-of note in this case was important to evaluating a lawyer's decision in the case. When asked if he had ever seen or heard of a note like the complained-of note, Martinez responded that he had only heard of a jury note asking, "How many zeros in 10 billion?" Martinez stated that the complained-of note would affect negotiations between the parties. Martinez testified that, based on the note, he would "know that they [the jury] are on the damages question . . . ."

On cross-examination, Martinez stated that he did not know "if the jurors would know that the lawyers can see the notes. They send it to the judge." Martinez was not surprised that Cortez testified that she did not know that the lawyers were reading the jury notes. He said, "I would think that most jurors would think that a note was going to be a direct communication with the court." Regarding reliance on the note, Martinez stated, "You take these notes and you take your best—your best guess, your best educated guess as to what . . . . It's not just—it's an educated guess, because you're going to take that and then go rely on it in order to negotiate and do whatever it is that you're doing." Martinez acknowledged that he had been involved in cases where he is surprised by the results based on the jury notes. Martinez testified that if he were the plaintiffs' attorney and read the complained-of jury note, he would "know that they [the jury] have gone passed [sic]" the questions on liability.

Christina Gamez testified that she was a juror in the personal injury case. Gamez did not know that Cortez sent the complained-of note to the trial court. Gamez stated that the complained-of note did not reflect the jury's discussions and that the jury as a whole had not discussed the maximum amounts that could be awarded. Gamez was told of the note when lawyers asked her for a deposition. Gamez testified that the

16

settlement agreement was unexpected; she said, "They took, you know, about a month, month and a half of our time for nothing because we didn't do our part in any of it at the end." Gamez said that the jury had not answered question number two, and she believed that it was half for Ford and half against.

When asked, "Looking at this note now, 'What is the maximum amount that can be awarded,' can you see how that question might have had impact on those lawyers who were waiting on the jury deliberations," Gamez replied, "Yes." Gamez agreed that the note could have led Ford's attorneys to believe the jury was deliberating damages. Gamez stated that the jury was not discussing damages. Gamez did not believe that Cortez had faithfully executed her duties as the presiding juror.

Gamez explained that the note regarding confusion between preponderance of the evidence and beyond a reasonable doubt was relevant to the jury's discussions and that all of the jurors agreed that Cortez should send that note to the trial court. Gamez stated that when the settlement occurred, eight jurors were for Ford, and she believed that they were getting closer to a verdict. When asked how she felt about the complained-of note, Gamez said, "Disappointing. It was very disappointing. I had no idea it had been sent out. I still question, to this day, why she would send that note." Gamez felt that it was strange that Cortez did not stay to exchange phone numbers with the other jurors or to talk to the lawyers after the parties settled.

On cross-examination, Cantu asked Gamez if she remembered which particular juror was confused regarding preponderance of the evidence versus beyond a reasonable doubt, and Gamez replied, "I'm going to think I was one of them, because to this day, I don't know the difference." When asked how she could have answered no to

question number one if she was still confused about the difference between preponderance of the evidence and beyond a reasonable doubt, Gamez said, "I didn't understand the difference between those two words, no, but in all our discussion, and how we related to the question, and our interpretation of what it meant, my answer to it was 'no.'"

> Gamez stated that she felt "cheated" by the settlement agreement

> because of one person's idea to send a note on her own, with her own question, not asking the rest of us our opinion about that question, or anything like that, she sent it on her own. Because of her, our six weeks, you know, close to two months, all our time that we gave to this was down the drain. You know, we didn't get to participate. We didn't—we were there for nothing. They wasted our time.

When asked whether she had already determined question number two in Ford's favor, Gamez said that she had not decided yet and that she had answered no to question number one concerning the roof of the Explorer, but she "didn't know the rest of the questions. That didn't make [her] decide on anybody [sic] yet." Gamez elaborated, "I'm not sure if I would have answered 'yes' or 'no' that would have made it that she gets all this money. I didn't answer the question, I'm still undecided. I didn't get enough facts or enough knowledge to know whether this vehicle was defective enough or not." Gamez agreed that if she had found Ford liable she could have conceivably voted to award up to $35 million for Rosa's injuries.

Cantu read a statement to Gamez by Rosa Linda Salinas, another juror in the personal injury case, stating that there were about three or four other jurors who believed that the complained-of question was inappropriate. When asked if there were eight jurors who wanted Cortez to ask the question, Gamez said, "I don't remember." Cantu reminded Gamez that she had said she saw the note asking, "Who gets to decide

18

how the money is distributed between [the] attorneys and the family" and that the jury was "discussing the lady in the wheelchair [Rosa], and we all felt for her because for the rest of her life, she was going to be in a wheelchair.  And we did kind of talk about her medical expenses for the rest of her life."  Gamez testified that she recalled that she had made these statements and that the jury had been discussing that issue.

Esmeralda Cuellar, a juror in the personal injury case, testified that the personal injury trial took approximately one month, and she took her duties as a juror seriously. Cuellar recalled that no one wanted to be the foreperson, and Cortez said that she would do it if no one had a problem with her taking the position.  Because no one wanted to take the role, everyone agreed to let Cortez be the foreperson.  Cuellar stated that all of the jurors quickly decided to answer the first question on Ford's liability, "no."

According to Cuellar, Cortez would send out a note to the trial court only after the entire jury discussed the note and agreed to send it.  Cuellar stated that the complained-of note was sent without the agreement of the entire jury and did not reflect any of the jury's discussions.  Cuellar testified that "about three" jurors told her that they did not agree with sending the complained-of note to the trial court.  Cuellar did not approve of sending the complained-of note.  Cuellar stated that the complained-of note did not reflect the jury's discussions because the jury was not discussing "any type of money."  Cuellar agreed that the complained-of note could be misleading to others who may have believed the jury was discussing damages.  Cuellar stated that she "felt cheated in a sense.  It shouldn't have been decided by one person."  Cuellar still felt cheated because she "wasn't accounted for.  [She] never agreed for [the complained-of] note to be sent out."

19

On cross-examination, Cuellar testified that the jury had not decided the second question on liability in Ford's favor. Cuellar could not find any instructions in the trial court's jury charge stating that the jury had to unanimously agree before the foreperson sent a question to the trial court.[10] Cuellar explained that during deliberations, she and about four other jurors were in the corner discussing question two, and "we didn't find out about [the complained-of] note after we—because when you're in the jury room, you're all talking at the same time." Cuellar agreed that it can be confusing because "you're all talking about the stuff that you need and all of that." Cuellar clarified that when she said "we didn't find out" about the complained-of note, she was referring to herself and the four or five jurors who were "where the wall is" in the corner discussing that Ford was not liable for the accident. Cuellar stated that those jurors "did not hear [the complained-of] question because [they] were still deliberating. [They] were talking about the information that was given to [them]." When asked if she could have changed her mind and decided that Ford was liable for the accident, Cuellar responded, "Oh, yes, because we were barely on Question No. 2." Cuellar agreed that she did not know how the jury would have voted, and it could have found Ford liable.

Salinas testified that she served on the jury in the personal injury case approximately five years earlier. Salinas recalled that the jury did not vote for a foreperson because Cortez said she would do it unless anyone had any objections. Salinas explained that the jury's procedure for sending notes to the trial court was to discuss "what was going out" and then Cortez would write the note and send it to the

---

[10] The jury charge contains no such instruction.

judge. According to Salinas, before sending the notes to the judge, Cortez would ask for approval from the other members of the jury.

Salinas testified that the jurors had not agreed to send out the complained-of note, that the jury had not discussed how much it would potentially award appellants, and that it was not reviewing the questions concerning damages. Salinas did not find out about the complained-of note until the parties settled, and the jury was called back into the courtroom. When asked if that complained-of note was a reflection of the jury's discussions, Salinas replied, "No. [Cortez] had brought that question up that she wanted to know, and we had told her that that wasn't an appropriate question to ask, since we had not answered Question No. 2, and we were not even close to any— knowing or having to do anything with that."

Salinas stated that before sending the complained-of note to the trial court, Cortez did not ask the jurors in her presence for approval. Salinas was surprised that the complained-of note had been sent to the trial court, "[b]ecause it had been discussed that we weren't going to ask that question." Salinas felt that Cortez, "didn't let [the jury] finish [its] job[]. She asked something that she was told not to ask, and, you know, I—I felt like I was cheated. I was cheated because she did not do what we asked her to do." Salinas did not believe there was any reason for Cortez to send the complained-of note to the trial court. Salinas thought it was reasonable for the lawyers to think that the jury was considering damages and that it was "very misleading" to Ford. To Salinas's knowledge, no other juror had asked Cortez to ask the complained-of question.

21

On cross-examination, Salinas testified that the jury had not answered either of the two questions concerning Ford's liability—questions one and two. Salinas did not recall the amount of votes for each side, but only recalled that the jury had not come to an agreement on liability. Salinas agreed that she and two of the other jurors, Virginia White and Cuellar, felt "cheated," and that she was still "[a] little bit" angry. Salinas stated that she had voted in favor of Ford and was upset that Rosa was getting three million dollars from Ford.

Salinas acknowledged that she and two other jurors—Ester Hernandez and White—had become friends. Salinas had last spoken with White one week prior to her testimony. Salinas testified that when she had lunch with these jurors, they had discussed the complained-of note. Salinas said that they felt cheated.

Salinas stated that during deliberations, Cortez had said "that the only way that you can get anything is by suing. She did make that comment. . . . And I know, because I got into it with her." When asked, "You argued with [Cortez]," Salinas replied, "Yes. . . . I told her that that was not true. I said, 'I work for a company where just because you don't like something doesn't mean you have to take them to court.'" Salinas elaborated, "I mean, just because you don't like something or something happens to you doesn't mean that life has to be easy for you because you have to go and sue somebody to get money."

Cantu reminded Salinas that in a statement given approximately one month after the personal injury trial, she agreed that she made it clear to Cortez that she did not want the damages note to be sent to the judge. She stated, "I did tell her that I didn't think that that was the right question to ask, and I didn't think the judge could give us an

22

answer." Salinas testified that Cortez had requested permission to ask the question but "we told her not to." Salinas said that Cortez "brought it up, and . . . we had a discussion about that, and she asked, 'Should I ask?' And we told her, 'No.' But we didn't know that she had written down that question." Salinas claimed that Cortez sent the note to the trial court without any of the jurors' knowledge.

White testified that the personal injury trial took approximately six weeks. White stated that the jury all agreed to answer the first question in favor of Ford; initially, Cortez had voted "yes" to question one but had "changed her mind" and the jurors all agreed to answer "no." The jury had still been deliberating question two when Cortez sent the complained-of note to the trial court. Regarding the second question on liability, White said that some of the jurors "felt that Ford was at fault and some of us felt that they were not to be held responsible for it." White believed that six or seven jurors were for Ford and "about four—four of them were holding out. . . ." White explained that several of the jurors "were coming around" and were on the verge of finding that Ford was not liable for the accident before the case settled. When asked if the jury discussed damages, White responded, "It was attempted [by Cortez]. It was attempted several times, and we would keep bringing it back to No. 2 several times. It was told that we need to focus on No. 2, we could not go on with the rest of the issues that stand until all—1 and 2 were answered." White testified that Cortez "kept saying, 'I wonder how much money would be involved? I wonder who would get it,' comments like that continued. And then we would try—we would tell her—one [] particular person would tell her, 'That's not the issue right now. We need to get back to answering No. 2.'"

White said that although the jury was instructed to answer questions one and two before answering the questions on damages, the discussion "kept going in that direction."

White stated that none of the notes that Cortez sent to the trial court were seen by the other jurors and they did not know what was written in the notes. The notes were discussed and then Cortez would write it down and send it. According to White, the jurors never exactly set out that they had to agree to send a note before Cortez sent it. White did not know about the complained-of note, and it was not reflective of any of the jury's deliberations regarding question two. White did not believe there was a reason for Cortez to send out the complained-of note and there had not been any discussions regarding the maximum amount of damages. White said that she did not know why Cortez sent the complained-of note, but that on that day, Cortez "came in and she was very happy, very upbeat. [Cortez] said, 'This will be settled today. I reviewed what I want to talk to you-all about, and we'll be out of here.'" White discovered that Cortez had sent the complained-of note after the case settled. When asked if the jury was discussing damages, White responded, "We were not. Just—[Cortez] would start thinking about it, talking about it, but we would tell her, you know, 'Let's go back to No. 2.'" White could see how the complained-of note could be misleading.

On cross-examination, White stated that she has had lunch on several occasions with some of the other jurors including Salinas and Cuellar. White testified that she was not aware of any contacts or outside influence Cantu or his law firm may have had on Cortez either directly or through an agent. White denied telling Ford's attorneys, "[W]hy did you settle the case? Ford was going to win." White was disappointed that Ford "was held [liable] for [Rosa's injuries]." White acknowledged that she had stated that

24

she was not going to vote that Ford "deliberately put out a vehicle to injure people when that was not even a question that was asked . . . ." White testified that based on the evidence presented, she wanted Ford to win the case.

When asked if she felt cheated, White replied, "Not cheated, no I wouldn't say cheated. . . . I guess it was a lot of disappointment. I was very disappointed, yes, that Ford didn't win." White stated that she discovered that the lawyers had been reading the jury's notes after the case settled and the judge let the jury know that the lawyers used the notes to determine what the jury was discussing. White was not aware that Tassie had made an offer to settle the case even before the complained-of note had been sent. White never asked Cortez why she sent the complained-of note to the trial court. White acknowledged that she had previously stated that "I wish this had never happened to Ford Motor Company. I—I feel maybe I failed in trying to get my point across, but this was so much to look at and not enough time was given to us." When asked if she felt sympathy for Rosa, White said:

> Sir, what I believed and what I went in there for, and what I listened to evidence, and what I read, that's how I voted. . . . I work . . . and I pay insurance for—I pay three insurances. I pay work to—to have insurance if I'm not able to work. Now, yes, it's a shame [Rosa] is like that, but, sir, I can—I can give you a list of things that's a shame. I have people in my own family that—that they're—they're hurt. They have things going on in their life, but I'm not trying to find somebody to pay for it or to keep them living in a nursing home for the rest of their life [sic]. So where is the fault for this gentleman that was driving the car [involved in the accident]? Why is it that big companies always have to pay for someone's fault that down [sic] here on the bottom of a ladder? And that's how I believe, and you're not going to change my mind and tell me that Ford ran out to try to settle when you took the settlement too for a lot less if you'd known—if you would have known that jury would have voted your way, you would never have settled for 3,000,000, not when you read cigarette companies are getting [sic] 20 $30,000,000.00 lawsuits. I—I don't believe it.

25

Samuel Ramirez Jr., a juror in the personal injury case, testified that Cortez volunteered to be the jury's foreperson, and he did not object. Ramirez recalled that the judge told the jury that in order to send a note, the members of the jury had to unanimously agree to ask the question or send the note. Ramirez stated that the jury would discuss a note and if they all agreed, Cortez would send the note to the trial court.

Ramirez testified that the jury was deliberating the second question on Ford's liability and that eight jurors intended to vote in favor of Ford, two intended to vote in favor of appellants, and "two were still skeptical to say 'yes' or 'no.'"

Ramirez did not know that Cortez decided to send the complained-of note to the trial court. Ramirez stated that Cortez had

> mentioned about what would be the percentages, and I told her, "Well, we haven't even gotten to the—you know, the money factor part of the case, so we need to first answer this particular question, Question No. 2, which then—well, if we would have answered all of us as a unanimous yes, then we'd go into the financial status of the case."

According to Ramirez, the jury was not discussing the maximum amount of damages that could be awarded to appellants. Ramirez explained,

> The only one that brought up that question, that she wanted to know percentage, was [Cortez]. And I recall me and—I believe it's a white lady, I believe Ms. White, we said, "Well, we, more or less have our"—we heard it mentioned during the course of the trial some percentages, but we—some of us wrote it, and I wrote it. I don't recall what were the percentages, but with my experience, usually it's between 30 percent, I believe, that usually the attorney gets if they win the case. And I asked her, "Would you like to see my notes?" And she replied, "No."

Ramirez agreed that the complained-of note was not relevant to the jury's discussion regarding question two. Ramirez testified that the jury did not agree to send the complained-of note to the trial court. Ramirez could see how the complained-of note

could impact Ford and cause Ford to settle the case. Ramirez stated that the jury was not in fact discussing the maximum amount of damages.

2.      Appellants

Joe Saurez, a juror in the personal injury case, testified that the jury had discussed the question Cortez asked in the complained-of note. Saurez stated,

> I was actually like on the jury table sitting right next to [Cortez], so I actually saw her when she wrote it and told everybody if they had any problem with her sending it. But since everybody at that time was talking like different amounts, I'm not sure if other people heard it. . . . [S]ince everybody was talking about the maximum amount, there was [sic] other people that were saying it, and then I know she was talking to other people to see if others agreed with that. . . . With that question, to send it out.

Saurez claimed that he told Cortez to send the complained-of note to the trial court. Saurez observed Cortez knock on the door of the jury room and give the complained-of note to the bailiff. When asked, "[T]hey're saying that somehow [the complained-of] note was sent by [Cortez] without any of the jurors knowing. Is that a true statement," Saurez replied, "No, sir." Saurez recalled that there were discussions about the maximum amount that could be awarded, "Because everybody was saying like, 'Oh, you can't say poor Rosa is going to get the money, since most of the lawyers are going to get most of the—the money awarded to her.'" Saurez remembered discussing the question, "Who gets to decide how the money is distributed between [the] attorneys and the family?" However, Saurez did not recall Cortez sending that note to the trial court. Saurez testified that some of the jurors, including White, were saying that "most" of the money would go to appellants' lawyers. When asked if the jurors discussed percentages, Saurez said, "Yes. I believe it was like five or 10 percent that was going to be just for her and the rest for the lawyers." Saurez believed that the judge was the only

27

person reading the jury's notes and that the other jurors had the same impression. Saurez had voted in favor of Ford on question one. Saurez did not think that the jury had reached a decision on question two.

On cross-examination by Ford, Saurez stated that he did not know that the lawyers in the personal injury case were reading the jury's notes. Saurez clarified that he did not know whether the other jurors knew that the lawyers were reading the notes. Saurez agreed that if the jury had discussed money it was not in reference to question two. Saurez could not recall whether other jurors objected to sending the complained-of note to the trial court. Saurez stated that he had not asked the complained-of question, but that he did tell Cortez to send it "so everybody could be [one] hundred percent sure. . . ." Saurez said that "there was [sic] other jurors that were asking [about the maximum amount of damages that could be awarded besides Cortez], that's why we [the jury] were discussing it. So it wasn't just like one person talking back to somebody else."

On re-direct examination, Saurez stated that "[a] lot of people knew about [the complained-of] note." Saurez "knew" that other members of the jury were talking about how much money the lawyers were going to make and that the jury was discussing money and damages.

Maria Ofelia Ramos, a juror in the personal injury case, testified that for the most part, she was "for Ms. Rosa Martinez," and she did not vote in favor of Ford. Ramos remembered White as being "for the Ford Company." Ramos stated that she was familiar with the complained-of note because she had told Cortez to ask the question. Ramos stated, "I was the one that had asked the question, yes, but I never knew if she

had turned it in or not." Ramos recalled that "everybody" was talking about money. Ramos testified that she told Cortez to ask the complained-of question "[b]ecause [she] figured that Ms. Rosa Martinez was, you know, liable to get what she deserved, her money coming from Ford. It was only right for her to get her money."

On cross-examination by Ford, Ramos acknowledged that she never disclosed to Ford's attorneys that she told Cortez to ask the complained-of question. Ramos agreed that in order for the system to work, the jury notes should be approved by all of the jurors. Ramos stated that the jury had been discussing the note and "We were all there together and she said that she was going to send it in, but that's it. I don't recall whether she sent it in or not. But the rest of the other notes, all of them were going into [the judge's] hands, so I imagine that if she was going to write it, it was going to get to [the judge's] hands, too, like all the other ones." Ramos did not recall whether any of the other jurors were aware of the complained-of note.

On re-direct examination, Ramos reiterated that she asked Cortez to send the complained-of note. Ramos stated, "I wanted to know whether [Rosa] was going to come into her money, which was only fair to get whatever she deserves, and that was my question."

Efrain Garcia, a juror in the personal injury case, testified that Cortez was the presiding juror on the case and was in charge of sending notes to the trial court. When asked who he believed was reading the jury's notes, Garcia responded, "We just thought of it being by the judge." Garcia did not know that the attorneys were reading the jury's notes. Garcia was asked why Cortez sent the complained-of note, and he responded, "A lot of people were still debating whether—who to pick for and then there

29

were some comments made, 'Well, all the money is going to go out to the lawyers' where people were saying, 'Let's ask.' I know [Ramos] was one of them who asked, and some other jurors asked, also, 'Let's go ahead and ask how much money would be awarded.'" Garcia recalled that Ramos and several other jurors wanted Cortez to ask the complained-of question.

On re-direct examination, Garcia agreed that the complained-of note did not pertain to question two and that others reading the note may have assumed that the jury was deliberating damages. Garcia recalled that other jurors had objected to the complained-of note and that the jury "really didn't say not to send it out." Garcia did not recall anyone specifically saying not to send that note to the judge. However, Garcia agreed that other jurors had voiced objections to the complained-of note. Garcia did not believe that the question was helpful.

Maritza Lopez, a juror in the personal injury case, testified that some of the jurors wanted to know the maximum amount of damages that could be awarded and how the money would be divided. Lopez said that the jurors argued over the complained-of note; some of the jurors said that the complained-of question was premature and others stated, "it's just a question." According to Lopez, the jurors were aware that Cortez was sending out the complained-of note.

On cross-examination, Lopez agreed that she had voted "no" to question one on the liability issue in favor of Ford. Lopez acknowledged that the jury was instructed to answer the two liability questions before answering the questions on damages. Lopez stated that she did not authorize Cortez to send the complained-of note to the trial court. When asked if any other juror authorized the complained-of note, Lopez replied, "I

30

wouldn't know if somebody did or not because there was a lot of talking. . . . I heard some people saying it was okay to be sent out, I just don't know who did by name." Ford's counsel pointed out that, five years earlier, Lopez stated that no other juror had authorized Cortez to send out the complained-of note.

On re-direct examination, Lopez stated that she did not know that the attorneys were reading the jury's notes. Lopez believed that only the judge was reading the notes.

Rosalinda Mendez, a juror in the personal injury case, testified that she recalled "we were all talking. 'Well, how much is [Rosa] going to get because we need to know if she's going to get something?' And [Ramos] told [Cortez] to ask Judge Limas how much the maximum was [Rosa] was going to get, so she started writing it and called the . . . bailiff. And gave it to him to give it [the complained-of note] to Judge Limas." When asked if she was aware that the lawyers for both sides were reading the notes, Mendez stated that she thought only the judge was reading the notes. Mendez recalled that "everybody" sitting around her was talking about how much money Rosa would get and how much money the lawyers would receive. Mendez testified that Cortez wrote the question, "Who gets to decide how the money is distributed between [the] attorneys and the family" "[b]ecause we were afraid that the lawyers would get more than Rosa would." According to Mendez, the jurors argued about how much money Rosa would receive.

Regarding the complained-of note, Mendez recalled that the jurors had discussed sending it out. Mendez said,

> I remember that they were saying, "Well, let's ask them how much—how
> much they're going to be distributed, how much, you know, every—if the

31

judge is going to take so much out of her and all that." And then they started saying, "Okay. Let's send it." And she would write it. She didn't show it to us, but she wrote it and then she gave it to the [bailiff].

Appellants recalled Mendez to testify the day after her testimony. On recall direct examination, Mendez stated that she had called Cantu after she testified and asked him why he had not asked her questions concerning how Ford had treated her. Mendez wanted to discuss how Ford had treated her when its investigators went to her home and interviewed her shortly after the personal injury case ended. Mendez said,

> After two, three weeks when they came to see me, they came and they had a recorder. There were two men with a recorder and they would ask me, "Rosalinda, when—when—did you have Friday off? Do you remember?" And I said, "No." "Are you sure?" I said, "Well, no, I don't remember. I'm sorry. I don't remember." Because then he would get frustrated or either mad. I don't know. He would tell the other man to stop the recording and rewind it and he would tell me, "Don't you remember that you went to a football game?" And I go, "I don't go to football games. I don't like football games. So I don't remember why they gave us off." "Oh, did you go early?" "I don't remember." So I don't remember. And then he would tell me, "Well, remember here, here, here. You went to— they told you to go home because you went to a football game." And I said, "I don't go to football games, so I don't remember when it was. It could have been Monday, Tuesday, Wednesday. I don't remember."

> So he would tell me what to say, and I said, "Okay." But everything was, to me, no, because I didn't remember.

When asked if the men would record her statement and then rewind the tape, Mendez replied, "Yeah. And then he would get frustrated with me because I didn't remember." Mendez recalled that the men were at her home for approximately two hours. Mendez claimed that the men did not "like" what she was telling them because "they would turn [the recorder] off and rewind it so they could—so they could tell me." Mendez felt that the men "took advantage" of her because "they were forcing [her] to answer questions that [she] didn't remember." When asked if the men "were putting

32

words in [her] mouth," Mendez replied, "Well, I—I say yes." Mendez stated that she felt intimidated by the men.

On cross-examination, Mendez was asked if she remembered telling the men that she did not feel threatened. Ford showed Mendez the transcript of her statement and she read into the record that she was asked by the interviewer if he had threatened her in any way, and that she had responded, "No, no, no."

Rosa testified that she was in the accident on July 13, 2002 after visiting a church in San Juan de los Lagos, Mexico. At the time of this trial, it had been seven years since the accident and Rosa was fifty-two-years-old. Rosa has lived in a nursing home in Brownsville, Texas since August 30, 2002. Rosa has been in and out of the hospital over the past seven years approximately twelve times due to a kidney infection. Rosa usually stayed in the hospital for about ten to fifteen days.

Rosa recalled that five years prior to this trial, Ford entered an agreement to pay her three million dollars. Rosa stated that Ford had not paid the money to her.

When asked if she understood that "Ford is saying that you, Rosa Martinez, through somehow, either through me, or an agent, they have to prove that you knew and somehow you got [Cortez] to send out a note," Rosa replied, "Yes." Rosa testified that she did not "know" Cortez "until the day before yesterday when she came to testify, that's when I saw her." Rosa stated that she knew that Cortez had been a juror but that she did not know Cortez personally. Rosa said that she did not know any of the people who presided as jurors in the personal injury case. Rosa denied telling Cortez to send out the complained-of note and stated that she had never spoken with Cortez.

33

## C.    Fraud

Question number three in the jury charge asked, "Was the note, 'What is the maximum amount that can be awarded,' sent by Cynthia Cortez for the purpose of fraudulently inducing Ford to settle with the Castillo family?"  The jury answered, "Yes." The jury was instructed, "If you have answered the preceding Question [number three] 'yes' then answer the following Question No. 4.  Otherwise, do not answer question No. 4."  Question number four asked:

> Was the note, "What is the maximum amount that can be awarded"—
>
> 1.  a material misrepresentation;
>
> 2.  sent by or at the direction of plaintiffs [appellants] or their agents or  representatives with the knowledge it was false;
>
> 3.  with the intent that Ford Motor Company rely on the representation;
>
> 4.  that Ford Motor Company did not know the representation was false and actually and justifiably relied upon the representation; and
>
> 5.  that Ford Motor Company detrimentally relied on the representation by entering into the settlement agreement.

The jury answered "Yes" to question number four.[11]

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found by a preponderance of the evidence:  (1) that Cortez sent out a note asking "What is the maximum amount of damages that can be awarded?" without the consent and knowledge of many of the jurors; (2) that Ford inferred from the note that the jury had already found Ford liable and was determining what damages to award

---

[11] We note that although the jury answered question four affirmatively, in the jury charge, there are handwritten checkmarks written after 1, 4, and 5 and a "y" written after 3.  Nothing is written after 2.

34

to appellants; (3) that in fact, the jury had not yet found Ford liable for the accident causing appellants' injuries when the note was sent to the trial court; (4) that there were two questions regarding Ford's liability; (5) that ten jurors had answered question one "No" and found Ford not liable under appellants' first theory of recovery; (6) that eight jurors had already expressed the opinion that Ford was not liable under question two; (7) that Cortez was the only juror who wanted to answer the first question on Ford's liability, "Yes"; (8) that during settlement negotiations on the night before Cortez sent out the note, Cantu told Ford's attorney that his demand would increase to three million dollars if the jury sent out a note concerning damages; (9) that Cortez told the jury the morning she sent out the note that the case would be settled; (10) that the jury had agreed on a protocol for sending notes to the judge, and Cortez violated that protocol; and (11) that after becoming aware of the note, Ford agreed to settle the case for over one million dollars more than it had originally offered. *See City of Keller*, 168 S.W.3d at 807.

However, in order to find appellants liable for Cortez's alleged fraudulent acts, the jury must have concluded that the note was sent to the judge by or at the direction of appellants, their agents, or their representatives with the knowledge that it was false. There is no evidence that Cortez was appellants' agent or representative. Furthermore, we find no evidence that appellants, their agents, or any other representatives directed Cortez to send out the note. There was no testimony from any of the witnesses that Cortez contacted or communicated with the appellants, their agents, or representatives. Furthermore, it does not appear from the record that Ford claimed that appellants, themselves, directed Cortez to send out the note. The only possible scenario which

would support the jury's finding then, would be if the note was sent by or at the direction of appellants' agents or representatives.[12] At trial, it was established that Cantu acted as appellants' representative in negotiating the settlement with Ford. However, again, there was no evidence presented that Cantu directed Cortez to send the complained-of note to the judge.[13]

To the extent that the jury may have relied on Cantu's statement that he would increase his demand if there was a note concerning damages, we conclude this is meager circumstantial evidence. *See Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010) (citing *City of Keller*, 168 S.W.3d at 814); *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (holding that a jury may not reasonably infer an ultimate fact from meager circumstantial evidence where circumstantial evidence is slight, and something else must be found in record to corroborate probability of fact's existence). Evidence at trial

---

[12] This is consistent with the following illustration:

> A, who is not C's agent, induces B by a fraudulent misrepresentation to make a contract with C to sell land to C. C promises to pay the agreed price, not knowing or having reason to know of the fraudulent misrepresentation. Since C's promise to pay is value, the contract is not voidable by B. The contract would be voidable by B if C learned or acquired reason to know of the fraudulent misrepresentation before promising to pay the price.

RESTATEMENT (SECOND) OF CONTRACTS § 164 cmt. e (1981). In this case, even assuming, without deciding, that Cortez's note was a fraudulent misrepresentation, there was no evidence presented that appellants learned or acquired reason to know that Cortez made the alleged fraudulent misrepresentation before promising to release Ford.

[13] At trial, Ford asked Cortez if she had contacted any attorneys during the course of the personal injury case, and Cortez stated she did not. Ford's attorney then produced phone records he claimed belonged to Cortez. Cortez would neither confirm nor deny that the phone records belonged to her; however, she stated that the email address listed on the phone records did not belong to her because she never had an email address with Sprint. She claimed she did not know her phone number from that time period. Ford's attorney then informed Cortez that, based on his research, one of the numbers listed in the phone records that was called during the personal injury trial belonged to a lawyer, Jim Solis. Cortez denied making the call and stated that her husband may have made the call. Although Ford's attorney claimed that the number belonged to Jim Solis, no evidence was presented establishing the owner of the phone number. Furthermore, there was no other mention of Solis or evidence presented of how he may have been involved in the case.

36

established that Cantu's statement is consistent with the custom of plaintiff's attorneys and that a plaintiff is reasonable in making such a demand.  Cantu may have merely been stating the obvious when he told Tassie his demand would increase.  It may also have been purely coincidental that Cantu made this comment the night before the complained-of note was received by the trial court.  On the other hand, it is possible that Cantu made the comment because he knew Cortez would send the complained-of note to the trial court.  However, when the circumstances are equally consistent with either of two facts, neither fact may be inferred.  *See Jelinek*, 328 S.W.3d at 538.  Moreover, there is nothing in the record corroborating a finding that Cantu knew that Cortez would send the complained-of note to the trial court.  *See Lozano*, 52 S.W.3d at 148.  The jury was not free to infer from this evidence that Cantu directed Cortez to send the complained-of note to the trial court.  *See Jelinek*, 328 S.W.3d at 538 (establishing that when the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge).  This evidence compelled the jury to guess whether Cantu directed Cortez to send the complained-of note to the trial court.  Therefore, this evidence does not rise above a scintilla.  *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.").

Because there was no evidence that appellants, their agents, or their representatives sent or directed Cortez to send the complained-of note, the evidence at trial was not such as to enable reasonable and fair-minded people to reach the verdict

under review. Thus, we conclude that the evidence is legally insufficient to support the jury's finding that appellants were responsible for Cortez's alleged fraud.[14] We sustain appellants' first issue.

## D. Mutual Mistake

The party wishing to establish a mutual mistake must show that the parties were acting under the same misunderstanding of the same material fact. *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 326 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A mutual mistake of fact occurs when the parties to an agreement have a common intention, but the written contract does not reflect the intention of the parties due to a mutual mistake. *N. Natural Gas v. Chisos Joint Venture I*, 142 S.W.3d 447, 456 (Tex. App.—El Paso 2004, no pet.). In order for mutual mistake to apply, the proponent must establish that the contract sets out a bargain that was never made. *N. Natural Gas*, 142 S.W.3d at 447.

When a party alleges mutual mistake, the court should not interpret the language contained in the contract but should determine whether the contract itself is valid. *See Williams v. Glash*, 789 S.W.2d 261, 264–65 (Tex. 1990). Parol or extrinsic evidence is allowed to show mutual mistake if the contract failed to express the actual agreement of the parties. *N. Natural Gas Co.*, 142 S.W.3d at 456. If the court determines a contract sets out a bargain that was never made, the contract will be invalidated. *Williams*, 789

---

[14] We further note that in order to find that Cortez committed fraud, the jury had to find that Cortez sent the complained-of note with the intent that Ford rely on the allegedly false representation. However, no evidence was provided that Cortez knew that Ford's attorneys were reading the jury's notes. In fact, all of the jurors, including Cortez, testified that they did not know that the attorneys were reading the notes. The only evidence presented showed that the jurors believed that the notes were only being read by the judge to whom the notes were addressed.

S.W.2d at 264.  The doctrine of mutual mistake must not routinely be available to avoid the results of an unhappy bargain. *Id.* at 265.

Ford argues that the parties to the settlement agreement held a mistaken belief that the jury had found Ford liable for the accident and had reached the issue of damages.  Here, Ford intended to pay appellants three million dollars in exchange for release from liability.  The contract sets out that bargain.  The evidence presented at trial shows that both parties intended to set out the terms in the contract exactly as they were written, and the contract does not set out a bargain that was never made.  *See id.*

> To enable a party to a written contract to be relieved from liability thereunder on the ground of a mutual mistake of fact, the mistake in question must deal with a material part of the contract itself.  That is, the mistake must involve the subject matter of the contract and the substance thereof; it may not be related to a mere collateral matter, such as the inducement for the agreement.

*Brown-McKee, Inc. v. Western Beef*, *Inc.*, 538 S.W.2d 840, 844 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.).  The mistake must be related to a fact which is the very essence of the contract, and "material in the sense that it is one of the things contracted about." *Id.*  Here, the "mistake," if any, did not involve the subject matter of the contract. *See id.*  The fact that the jury *may have* reached the issue of damages in its deliberations was a mere collateral matter because it concerned the inducement to enter the agreement to settle for more money than previously offered.[15] *See id.*  Moreover, Ford did not present any evidence that appellants entered the contract based on the belief that the jury was deliberating damages.  Tassie unequivocally stated that the complained-of note had only one meaning; however, there is nothing in the record supporting a finding that appellants settled based on that belief.  *See Williams v. Glash*,

---

[15] Appellants also settled for less money than demanded.

789 S.W.2d 261, 264 (Tex. 1990) ("The question of mutual mistake is determined not by the self-serving subjective statements of the parties' intent, which would necessitate trial to a jury in all such cases, but rather solely by objective circumstances surrounding execution of the [contract].").

Furthermore, a party's prediction or judgment as to events to occur in the future, even if erroneous, is not a "mistake" as the word is defined in the Restatements of Contracts. RESTATEMENT (SECOND) OF CONTRACTS § 151 comment a (1981). The evidence presented conclusively proved that the jury had not reached a verdict. Ford's belief that the jury had determined that the jury would award damages was merely a prediction of a future occurrence. Ford's assumption that the jury would award damages was merely conjecture and speculation of a future event because the jury had not yet rendered a verdict. See id. Whether the parties were mistaken as to the jury's deliberations is immaterial because the jury had not determined that Ford was not liable. In other words, at the time that the parties entered the settlement agreement, the jury had neither ruled in favor of or against Ford.[16]

Finally, a mistake is not ordinarily available if the party assumes the risk of the mistake. De Monet v. Pera, 877 S.W.2d 352, 359 (Tex. App.—Dallas 1994, no writ) (citing RESTATEMENT (SECOND) OF CONTRACTS § 154(a) & (b) (1981)); see Commercial Standard Ins. Co. v. White, 423 S.W.2d 427, 433 (Tex. Civ. App.—Amarillo 1967, writ ref'd n.r.e.); see also Smith v. Lagerstam, No. 03-05-00275-CV, 2007 Tex. App. LEXIS 5722, at *21 (Tex. App.—Austin July 19, 2007, no pet.) (mem. op. on reh'g) ("[A] party to an agreement may not seek relief on the ground of mistake if the risk of the mistake

---

[16] See RESTATEMENT (SECOND) OF CONTRACTS § 151 comment a (1981) (providing that the erroneous belief must relate to the facts as they exist at the time of the making of the contract).

is allocated to that party."). A party assumes the risk of mistake if he "is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." RESTATEMENT (SECOND) OF CONTRACTS § 154(b). If even with this awareness, the mistaken party chooses to enter the contract, that party assumes the risk that he is wrong. *See id.*

Here, both parties entered into a Rule 11 settlement agreement with limited knowledge and decided to enter into the contract. Both parties were fully aware that the jury had not finished its deliberations and had not rendered a verdict. The parties chose to divine the jury's intent from the complained-of note and were wrong. Even with its limited knowledge regarding the jury's decision, Ford chose to settle the case with appellants. Ford was aware at the time the contract was made that it only had limited knowledge regarding the jury's decision and treated this limited knowledge as sufficient. The complained-of note did not state that the jury was actually deliberating damages; Ford merely inferred that the jury must have been discussing damages and had therefore determined that Ford was liable.[17] Even if the jury had determined that Ford was liable during its deliberations, the jury was free to change its answers to either question one, two, or both before it rendered its verdict.

Viewing the evidence in the light most favorable to the verdict, we conclude that Ford intended to give Rosa three million dollars in exchange for release of any and all claims. However, there is no evidence that the contract failed to express the actual agreement of the parties and that the alleged mistake was related to a fact which was the very essence of the contract. Furthermore, Ford was aware that the jury had not

---

[17] There is nothing in the jury charge instructing the jury that it could not change its answers to the questions on liability once it began deliberating the questions on damages.

41

rendered a verdict but chose to assume the risk of agreeing to settle with limited knowledge. Accordingly, the evidence at trial would not have enabled reasonable and fair-minded people to reach the jury's verdict in this case. We conclude, therefore, that the evidence was legally insufficient to prove by a preponderance of the evidence that Ford's performance of the contract was excused by virtue of a mutual mistake. We sustain appellants' second issue.[18]

### III. CONCLUSION

Having found that Ford is not excused from performing the contract due to either fraud or mutual mistake, we reverse the trial court's judgment.[19] We remand to the trial court for proceedings consistent with this opinion.[20]

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
24th day of January, 2013.

---

[18] Due to our disposition, we need not address appellants' other issues. *See* TEX. R. APP. P. 47.1, 47.4.

[19] By way of a "cross-point," Ford argues, in the alternative, that the trial court should have submitted its requested jury question, "Did the foreperson, Cynthia Cortez, subvert the integrity of the jury process by sending [the complained-of note to the trial court]?" Ford seeks a new trial based on this alleged trial court error. However, Ford did not file a separate notice of appeal although it seeks to alter the trial court's judgment; therefore, Ford has not properly invoked this Court's jurisdiction to consider its cross-issue. *See* TEX R. APP. P. 25.1(a), (c) (providing that a party who wishes to alter a trial court's judgment must file its own notice of appeal and that we may not grant more favorable relief than did the trial court except for just cause); *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 171 (Tex. 2004) (citing *Dean v. Lafayette Place (Section One) Council of Co-Owners, Inc.*, 999 S.W.2d 814, 818 (Tex. App.— Houston [1st Dist.] 1999, no pet.) (refusing to consider the party's challenge to the trial court's judgment because the party did not file a notice of appeal from the trial court's judgment, did not notice a cross-appeal, and did not file a petition for review)).

[20] Appellants filed a motion for leave to file a reply brief that was carried with the case. We dismiss the appellant's motion for leave to file a reply brief as moot.